IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
(MILWAUKEE DIVISION)

_____

| | | |
|---|---|---|
| SHAWN S. GENGLER, | ) | |
| on behalf of themselves and all others | ) | Case No.  2:16-cv-00180 |
| similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | **WINDSOR AND WOODGRAIN'S** |
| | ) | **MEMORANDUM OF LAW** |
| v. | ) | **IN SUPPORT OF THEIR** |
| | ) | **MOTION TO DISMISS COMPLAINT** |
| WINDSOR WINDOW COMPANY d/b/a | ) | |
| WINDSOR WINDOWS AND DOORS, | ) | |
| and WOODGRAIN MILLWORK, INC., | ) | |
| | ) | |
| Defendants. | ) | |

_____

## <u>INTRODUCTION</u>

More than a decade ago, windows manufactured by Defendant Windsor Window Company were installed in Plaintiff's home. About ten years later, he complained to Windsor that condensation had formed on the inside of the windows and caused damage around them. Windsor denied the claim, explaining that condensation damage is excluded from the warranty's coverage. This makes sense because, as Windsor further explained, indoor window condensation is, by definition, indoor *humidity* that *condensed* on the window. It is a sign not that the windows leaked, but rather that they (and the rest of the well-insulated home) didn't. And, as Windsor cautioned, condensation can be controlled only by keeping indoor humidity sufficiently low.

Fifteen months have passed. And now, Plaintiff has taken this (rightfully) denied warranty claim, and tried to make it into much more. He claims torts. He claims fraud. He claims that windows, which apparently gave him no reason to complain for at least nine years, were actually defective from day one, from the moment they left the manufacturing floor. And he

claims that there are more than 100 people out there who would join him in a class action.

But he has a serious problem: he has alleged no facts to support these scandalous claims, which are, in reality, no more than the facts of a (rightfully) denied warranty claim, dressed in the conclusory language of torts and fraud. This is fatal to the claims under Rule 8, *Twombly*, and *Iqbal* (not to mention Rule 9(b) for the fraud claims), particularly given the high stakes of this class litigation infused with fraud allegations. *See generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557-58 (2007) (a class action case)  (Rule 8 is necessary, "lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.") (quotations omitted).

Moreover, what we are dealing with here is not simply a plaintiff who *failed to allege* a sufficient factual basis to support his window defect claims, but rather a plaintiff who's only stated factual basis for his claims *affirmatively points to there being no window defect at all*. That is, to borrow language from a recent, remarkably instructive Wisconsin Court of Appeals case, Gengler stated, at most, a factual basis for finding that "the [window] condensation itself was a 'defect of the house,'" but not that the condensation resulted from "a 'defect' in the [windows]." *See Goldberg v. DiMaggio*, 2015 WI App 68, ¶¶1, 15-16, 364 Wis. 2d 757.

Defendants respectfully ask this Court to dismiss Plaintiff's Complaint with prejudice.

## **FACTS**[1]

Plaintiff Shawn Gengler's home was built in Muskego, Wisconsin in 2004, with construction completed in December of 2004. Compl. ¶ 64. The windows were installed during construction. *Id.* In the summer of 2004, Gengler purchased the windows, which were

---

[1] In accordance with the standard of review, Defendants recite the facts in the light most favorable to the Complaint. But Defendants do not concede their truth, and reserve the right to later challenge their veracity.

manufactured by Windsor. *Id.*[2]

Before deciding to buy the windows, Gengler "diligently searched for and reviewed many different window manufacturers' literature." *Id.*, ¶ 66. In "early 2004," he "toured" Windsor's Iowa manufacturing plant "to determine which manufacturer's windows and which window series he wanted to purchase for his home." *Id.*, ¶ 65. During that tour, Windsor's "representatives and agents" told him that the windows were "a superior product." *Id.* And apparently at some other unspecified time and in some unspecified way, Windsor also represented to him that the windows were "free of defects," "suitable for Wisconsin," and "compliant with building codes and industry standards." *Id.*, ¶ 67.

Gengler's windows are from Windsor's Pinnacle Series and are subject to the Pinnacle Limited 20/10 Warranty,[3] which provides, in relevant part:

> [T]o preserve the warranty, please refer to the Windsor Care and Use Guide on our website (www.windsorwindows.com).
> . . . .
> **ALL OTHER COMPONENTS – 10 YEAR WARRANTY**
> Window and door hardware components are usually manufactured by others and purchased by Windsor for use in our products. We do, however, provide a limited warranty against defects, under normal conditions, for **10 YEARS** from the date of manufacture on all non-glass components. . . . Windsor will provide replacement parts, free of charge, during the warranty period.
> . . . .
> **EXCLUSIONS:** The following items or conditions are specifically excluded from this warranty:
> . . . .
> 3. Damage caused by or adjustment required from . . . Condensation . . . .
> . . . .
> **LIMITS OF LIABILITY**

---

[2] In his Complaint, Gengler ignores the critical distinction between Windsor, which manufactures and sells the windows, and Defendant Woodgrain Millwork, Inc., which plays no role in that process other than to supply wood. Defendants' joint motion to dismiss does not ask this Court to resolve this dispute, but Defendants reserve the right to later seek its resolution.

[3] Gengler attached this warranty to the Complaint as Exhibit B. This Court may consider it in ruling on this motion because "[d]ocuments attached to the complaint are incorporated into it and become part of the pleading itself." *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 729 (7th Cir. 1999).

3

THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OF FITNESS FOR A PARTICULAR PURPOSE. No distributor, dealer, employee, salesperson, or representative of Windsor has any authority to change or modify this warranty in any way, either orally or in writing.

Compl., Ex. B (emphasis and color in original).

The 2003 "Care and Use Guide" referred to above provides a thorough explanation as to what causes window condensation and the dangers of allowing indoor humidity to get too high. McMillen Decl., Ex. 1, 2003 Care and Use Guide, "Condensation," at 6-7.[4] In particular, it listed "recommended winter humidity levels" of never more than 35%, along with lower recommended levels for when temperatures dip beneath 10°F, and included a crystal clear warning:

> These are the ***recommended*** humidity levels*, **and may not be applicable for every household**. Differences in glass types (LoE vs. clear) will allow for variances in humidity levels. **Window condensation is a good indicator as to the maximum allowable humidity level. If your windows begin to sweat, the humidity in your home is too high**.

*Id.* at 7 (emphasis added). The Guide moreover warned that "[c]ondensation on your windows could be an indicator that other moisture problems could develop, including mold or mildew on cold exterior wall surfaces, peeling paint, wood rot and the failure of wall insulation." *Id.* at 6.

In 2013, Gengler submitted a condensation-damage warranty claim to "Defendants." He alleges that he told "Defendants" that he had noticed "ice and condensation forming on the inside of several of his Windows, which was causing the wood to stain." Compl. ¶ 71. This was

---

[4] Gengler did not attach this 2003 version of the Guide to the Complaint, but this Court may consider it in deciding this motion because Gengler incorporated it by reference by including the Pinnacle warranty as Exhibit B, which states on its cover page that, "to preserve the warranty, please refer to the Windsor Care and Use Guide on our website (www.windsorwindows.com)."

> [T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment. The doctrine prevents a plaintiff from "evad[ing] dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that prove[s] his claim has no merit."

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (quoting *Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir. 2002)).

apparently only a problem "during the winter months." Compl. at Ex. A, 11/20/14 email.[5] In response, an unidentified "representative" told him that "condensation" was causing the damage, and that the condensation was being caused by the indoor humidity levels in Gengler's home. *Id.*

On November 18, 2014, Gengler submitted another condensation-damage warranty claim, this time as a Web Request on Windsor's website. Compl. at Ex. A, 11/18/14 Request. He claimed to have "extreme condensation on ALL windows and in some cases, black mold on the wood sills and water stains down our walls." Compl. at Ex. A, 11/18/14 Request.

On November 19, 2014, Windsor employee Betty Deemer replied, requesting pictures and stating that Windsor would review. Compl. at Ex. A, 11/19/14 email. She advised, however, that condensation "is not a [sic] covered in the warranty" and "is not a defect in the window but is a humidity problem inside your home." *Id.* She attached the windows' 2012 Care and Use Guide,[6] and included two links to videos on indoor humidity and window condensation. *Id.*[7]

The Guide (authored by Windsor) and the videos (from two other window manufacturers, Pella and Andersen) explain why window condensation is *not* a sign that windows are working poorly, *but a sign that they and the home's other insulation are working well*:

---

[5] Gengler attached copies of three electronic communications to his Complaint as Exhibit A: a November 18, 2014 "Web Request" that he entered on Windsor's website; a November 19 email response from Windsor employee Betty Deemer; and a November 20 email response from Gengler. As with the warranty (*see supra*, fn. 3), the Court may consider these emails. *See, e.g.*, *Ennenga v. Starns*, 677 F.3d 766, 775 & n.4 (7th Cir. 2012) (affirming dismissal of complaint based in part on "[a] copy of [an] email [that was] attached to" it); *Geary v. Univ. of Wisconsin-Milwaukee Dep't of Philosophy*, No. 12-CV-518-JPS, 2012 WL 6026336, at *3 n.2 (E.D. Wis. Dec. 4, 2012) (Stadtmueller, J.) (considering "an email chain" attached to an opposition to a motion to dismiss).

[6] Just as Gengler incorporated the 2003 version of the Guide by reference by including the Pinnacle warranty in his Complaint (*see supra* fn. 4), he incorporated the 2012 version of the Guide by reference by including the November 19, 2014 email in his Complaint. The "Condensation" sections of both versions of the Guide are identical, with the exception of two irrelevant changes: (1) the 2012 version stated "unknowingly designed" instead "unwittingly designed," and (2) the 2012 version capitalized the "l" in "loE vs. clear."

[7] Defendants quote from these videos in this brief. Although Gengler did not, he incorporated what they said by reference by including Deemer's November 19, 2014 email in Exhibit A, which relies on them as part of her explanation for why "[c]ondensation is not a defect in the window but is a humidity problem inside your home." *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) ("Bogie incorporated the video recording into her original complaint both by reference and by physically attaching the video recording to the amended complaint.").

- "During the process of creating a tighter, more energy efficient home, an increase in elevated indoor humidity presented itself. Older homes had been unknowingly designed and constructed with random gaps, which would allow for the release of warm, moist air and the replacement of cool, drier air. Newer construction methods do not allow for this natural air-to-air exchange, thus trapping any internally created humidity within the structure. Elevated amounts of humidity can cause condensation to form on cold surfaces. Sweaty, frosted or icy windows are all forms of condensation problems. Most assume that these are a problem with the window but, in fact, these are a symptom of excess humidity in the home." McMillen Decl., Ex. 2, 2012 Care and Use Guide, "Condensation," at 6.

- "[W]hen condensation forms, you might think that it's the window's fault. After all, that's where the moisture is. However, this is not the case. In fact, condensation is a sign that windows and doors are doing their job. Replacing drafty windows and doors reduces air flow in your home, making it tighter. Tighter homes actually retain more humidity. . . . Condensation forms when colder cool surfaces, like windows, chill the adjacent humid air and the water vapor in that air changes back to liquid water. In very cold climates, the interior glass, metal, or plaster surface can get so cold that the condensation turns into ice or frost." "Condensation Q & A," Pella, https://www.youtube.com/watch?v=S1dh-xGnpYU, 0:00-1:27, last accessed 3/21/16.

- "Condensation doesn't mean that there's a problem with your windows. In fact, the presence of condensation can actually be a sign that your windows have good, tight seals. Everything that makes homes more energy efficient—windows and patio doors that reduce air leakage, weatherstripping, modern insulation, vapor barriers, and new construction techniques also locks moisture inside your house and increases the chances of condensation forming." "Understanding Condensation," Andersen Windows and Doors, https://www.youtube.com/watch?v=bfUtBz8Pwyo, 1:20-1:48, last accessed 3/21/16.

On November 20, 2014, Gengler replied to Deemer that the window condensation had persisted, even though, "during the winter months," he ran two dehumidifiers (one on each floor of the home) "set at 35% humidity." Compl. at Ex. A, 11/20/14 email. He speculated that "this problem" was being caused by "a seal defect," based on something he read. Compl. at Ex. A, 11/20/14 email. He also stated that he would take more photos that night. *Id.*

On November 21, 2014, Gengler sent Deemer additional pictures of his windows. McMillen Decl., Ex. 3, 11/21/14 email.[8]

---

[8] Gengler did not include either this email or Deemer's November 25 response, despite cherry picking earlier emails in this exchange to include in Exhibit A of his Complaint. This appears to have been a calculated decision, as Deemer's November 25 email (which explains why Windsor denied his warranty claim) flatly contradicts Gengler's allegation that Windsor "never . . . respon[ded]" to his November 20 email. Compl. ¶ 76. *See*

On November 25, 2014, Deemer replied to Gengler's emails: "I did take this to the supervisor, and all agree your issue is humidity related condensation issue, not a window defect and will not be covered under the warranty. I have attached another link that might help you with your issue as well." McMillen Decl., Ex. 3, 11/25/14 email. The link is to a website that, like the Guide and the videos, explains that condensation is caused by humidity in well-insulated homes. *See* http://www.familyhandyman.com/windows/repair/how-to-avoid-and-remove-window-condensation/view-all#.VHN0DmS9Kc3, "Windows with a cold sweat," last accessed 3/21/16 ("Newer homes are typically built much more tightly than older ones. This is good for many reasons, but one bad side effect is that moisture generated indoors doesn't escape as easily.").[9]

Almost 15 months later, on February 17, 2016, Gengler filed this lawsuit. Compl., Doc. 1. He alleges nine counts against Defendants: breach of express warranty (Count I); breach of implied warranties (Count II); violation of the federal Magnuson–Moss Warranty Act (Count III); breach of contract (Count IV); violation of Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18 (Count V); fraudulent misrepresentation (Count VI); fraudulent concealment (Count VII); strict liability (Count VIII); and declaratory and injunctive relief (Count IX). *Id.* These claims all seek remedies for the alleged condensation damage to his windows and home.

Defendants' motion to dismiss all counts follows.

---

*Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004) ("[T]his court has long held that, when a document contradicts a complaint to which it is attached, the document's facts or allegations trump those in the complaint."). Courts rightly reject this kind of disingenuous gamesmanship. *See, e.g., Jayhawk Capital Mgmt., LLC v. LSB Indus., Inc.*, No. 08-2561-EFM, 2009 WL 3766371, at *10 (D. Kan. Nov. 10, 2009) (considering "complete email exchange . . . consist[ing] of three emails spanning several days" that defendant attached to motion to dismiss, when plaintiffs had only "reference[d] and quote[d] two of the three emails"); *Owens Trophies, Inc. v. Bluestone Designs & Creations, Inc.*, No. 12 C 7670, 2014 WL 5858261, at *2 (N.D. Ill. Nov. 12, 2014) (considering "entire email chain that is attached to defendant's motion to dismiss," even though plaintiff tried to avoid parts of it by "selectively quot[ing] from it").

[9] Deemer also explained that the applicable 10-year warranty had expired, as Gengler's windows were manufactured during "the 3rd quarter" of 2004. McMillen Decl., Ex. 3, 11/25/14 email. Defendants reserve the right to raise this argument at a later time. But they do not argue it here, due to Gengler's allegation that he first made his warranty claim in 2013 (which Defendants dispute, but assume to be true for the purpose of this motion only).

## ARGUMENT

### I.     Standard of Review

"[T]he motion to dismiss for failure to state a claim" is an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471, (2014). It "requires careful judicial consideration of whether the complaint states a claim that the defendant has acted imprudently." *Id.* To do so, the complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

### II.    The tort claims (Counts VI, VII, and VIII) must be dismissed.

#### A.  The economic loss doctrine bars the tort claims (Counts VI, VII, and VIII).

Gengler alleges three torts: strict liability (Count VIII), fraudulent misrepresentation (Count VI), and fraudulent concealment (Count VII).  These claims are barred by the economic loss doctrine, which bars building product tort claims against manufacturers that seek to recover for harm to the allegedly defective product itself and/or to other building components in the same structure. *Linden v. Cascade Stone Co.*, 2005 WI 113, ¶ 6, 283 Wis. 2d 606, 613 ("The economic loss doctrine is a judicially created doctrine under which a purchaser of a product cannot recover from a manufacturer on a tort theory for damages that are solely economic. Economic damages are those arising because the product does not perform as expected, including damage to the product itself or monetary losses caused by the product.") (quotation omitted); *see also Below v.*

*Norton*, 2008 WI 77, ¶ 24, 310 Wis. 2d 713, 726-27 (economic loss "results . . . from a product failing to live up to a contracting party's expectations") (quotation omitted).

That is precisely what this lawsuit requests: recovery for alleged damage to Gengler's "Windows and [his] home." Compl. ¶ 79. *See Linden*, 2005 WI 113, ¶29 (damage caused by defective stucco and shingling was economic loss because it was damage "only [to] other components of the house"); *Midland Builders, Inc. v. Semling-Menke Co.*, 2005 WI App 193, 298 Wis. 2d 132 (unpublished) ("[T]he homeowner could not recover in tort for the cost to repair or replace the rotting windows because his damages were economic losses."); *Bay Breeze Condo. Ass'n, Inc. v. Norco Windows, Inc.*, 2002 WI App 2005, ¶27, 257 Wis. 2d 511 (damage caused by windows to "interior and exterior walls and casements" was only economic loss because "these are but other component parts in" the windows' house).

The doctrine specifically "applies to building construction defects when, as here, the defective product is a component part of an integrated structure or finished product." *Linden*, 2005 WI 113 at ¶28. Thus, it bars tort claims against a window manufacturer based on losses allegedly caused by the window to the window and the surrounding structure. *See id.*, *following Bay Breeze*, 2002 WI App 205 at ¶27 ("[T]he windows are simply a part of a single system or structure, having no function apart from the buildings for which they were manufactured. Although the condominium units may have suffered incidental damage as a result of the failed windows, this does not take a commercial dispute outside the economic loss doctrine.") (citations omitted); *Midland Builders*, 2005 WI App 193 at *2–*3 (doctrine barred tort claims, as "the crux of [the] claim for repair costs [was] that the homes were damaged because an ingredient, Semco windows, was of insufficient quality and did not work for Midland's intended purpose").[10]

_____

[10] Gengler asserts damage to "other property," *e.g.*, Compl. ¶ 3, in an apparent attempt to end run around the economic loss doctrine. But this type of vague, conclusory pleading has been repeatedly rejected by federal

Fraud claims are treated no differently. *See Below*, 2008 WI 77 at ¶20 (economic loss doctrine "bars common-law claims for intentional misrepresentation in real estate transactions that occur in the context of residential, or noncommercial, sales."); *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 965 (7th Cir. 2000) (economic loss doctrine "bars Home Valu's intentional misrepresentation claim that it was fraudulently induced into executing the Amendment").

Therefore, the economic loss doctrine bars all of Gengler's tort claims (Counts VI-VIII).

**B. The fraud-based tort claims (Counts VI and VII) must also be dismissed because they are insufficiently pled under Rule 9(b).**

The fraud-based tort claims are claims of fraudulent misrepresentation (Count VI) and fraudulent concealment (Count VII). Fed. R. Civ. P. 9(b) requires dismissal of these claims.

Rule 9(b) imposes a heightened pleading standard for fraud, requiring that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This heightened pleading standard applies to both fraudulent misrepresentation and fraudulent concealment claims. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 568–69 (7th Cir. 2012).

> While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading ordinarily requires describing the who, what, when, where, and how of the fraud.
>
> ….
>
> By requiring the plaintiff to allege the who, what, where, and when of the alleged fraud, the rule requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate.

*Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 738 (7th Cir. 2014) (quotations omitted); *see also Wigod*, 673 F.3d at 569 (explaining that rule 9(b) is "a response to the great harm to the

---

courts when applying the doctrine, as the *Twombly–Iqbal* standard requires. *See, e.g.*, *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, 22 F. Supp. 3d 1322, 1327 (N.D. Ga. 2014) ("Although they generally allege damage to 'other property,' this is too ambiguous. Indeed, this is precisely the 'formulaic recitation of the elements of a cause of action' held insufficient to survive a motion to dismiss.") (quoting *Twombly*, 550 U.S. at 555); *Naparala v. Pella Corp.*, No. 2:14-MN-00001-DCN, 2015 WL 2379492, at *4–5 (D.S.C. May 19, 2015); *Walters v. Pella Corp.*, No. 2:14-CV-00544-DCN, 2015 WL 2381335, at *9 (D.S.C. May 19, 2015).

reputation of a business firm or other enterprise a fraud claim can do") (quotation omitted).

Gengler's Complaint provides no indication that he engaged in the precomplaint investigation that Rule 9(b) requires. Instead of supplying the "who, what, when, where, and how of the [alleged] fraud," Gengler supplies no more than the same formulaic recitation of the elements of fraud that would not satisfy even Rule 8, let alone Rule 9(b). And testing Gengler's fraud claims against the required elements of fraud[11] and Rule 9(b) reveals them to be precisely the sort of "defamatory and extortionate" fraud claims that Rule 9(b) was intended to prevent.

For example, take a fundamental element of any fraudulent misrepresentation claim: that there was "a false representation of fact." *Studio*, No. 06-C-0628, 2006 WL 3813697, at *2-3.

The most specific allegation that Gengler offers to plead this element is, as follows:

> 65.    In early 2004, Mr. Gengler toured Defendants' Iowa manufacturing plant in order to determine which manufacturer's windows and which window series he wanted to purchase for his home. During that inspection, Defendants' representatives and agents told Mr. Gengler that the Windsor wood clad windows were ***a superior product***. This representation is uniform and made about all of the Windows.

Compl. ¶ 65 (emphasis added).

As an initial matter, the vague "early 2004" allegation does not satisfy Rule 9(b)'s "when" requirement,[12] and the vague "Defendants' representatives and agents" allegation does not satisfy Rule 9(b)'s "who" requirement.[13] But even more concerning is that the critical "what" of the allegation—the alleged representation that the windows were "a superior product"—would

---

[11] *Studio & Partners, s.r.l. v. KI*, No. 06-C-0628, 2006 WL 3813697, at *2-3 (E.D. Wis. Dec. 27, 2006) (Griesbach, J.) (listing elements for fraudulent misrepresentation and fraudulent concealment).

[12] *See Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 949 (7th Cir. 2013) ("The 'when' is no clearer. . . . [A]ppellant failed 'to specify times and dates any more clearly than 'from July 2007 through the January 28, 2008 closing on the Second Loan' or 'prior to closing the Second Loan and/or at or around the time of closing the Second Loan' or '[f]rom August 2007 through December 2007.'"); *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 794 (7th Cir. 2004) (Rule 9(b) required "identif[ying] specific dates on which these misrepresentations were made").

[13] *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 730 (7th Cir. 1998) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"), *modified on other grounds by Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) (Rule 9(b) not satisfied when "the complaint lumped all the defendants together and did not specify who was involved in what activity.") (quotations omitted).

not satisfy even Rule 8, because it is mere puffing. "A general statement that one's products are best is not actionable as a misrepresentation of fact." *State v. Am. TV & Appliance of Madison, Inc.*, 146 Wis. 2d 292, 302 (1988); *see, e.g.*, *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 4, 270 Wis. 2d 146, 153 ("The plaintiffs also allege that Harley's advertising material described the motorcycle engine as 'premium' quality, 'a masterpiece,' and '[e]ighty-eight cubic inches filled to the brim with torque and ready to take you thundering down the road.' This is classic advertising puffery, non-actionable at common law and under the statute."). "This is so because a salesperson who simply declares that his product is the 'best' or the like, is not representing a fact at all, let alone misrepresenting one." *United Concrete & Constr., Inc. v. Red-D-Mix Concrete, Inc.*, 2013 WI 72, ¶¶ 27-28, 349 Wis. 2d 587, 606-07. "Puffing" is simply an "exaggeration[] reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined." *Am. TV*, 146 Wis. 2d at 301-02.

Apparently aware of this deficiency, Gengler tries to obscure it by, two paragraphs later, vaguely alleging additional representations (with their own Rule 9(b) failings), and mixing them with the puffing, through the use of "and through other methods" language:

> 67.    In deciding to purchase and install Defendants' wood clad windows, Mr. Gengler reasonably relied on the materials and uniform representations by Defendants at the time of the plant tour ***and through other methods*** that the Windows were superior products, the Windows were free of defects, the Windows were suitable for Wisconsin, and that the Windows were compliant with building codes and industry standards.

Compl. ¶ 67 (emphasis added). In resorting to the "and through other methods" language, Gengler abandons any attempt to identify these vaguely alleged representations as occurring at any particular "when" or "where," and he continues to lump together "Defendants" for the "who." In other words, all that the Complaint tells us it that, "somewhere, at some time, someone from or representing one and/or both Defendants made these cursory statements." But Rule 9(b)

requires more. Windsor cannot glean from the allegations what was purportedly said to Gengler, nor whether it was said by someone at Windsor, a Windsor distributor, or a third party like a builder. Nor can it determine in context whether the statement related to the windows Gengler purchased or to other Windsor products or windows like Gengler's manufactured at another time.

Also fatal to these fraud claims is that Gengler relies on conclusory pleadings as to Defendants' state of mind, that is, what Defendants "knew or should have known." "Plaintiffs must provide more than conclusory allegations to satisfy rule 9(b)'s requirement that the circumstances of the fraud be pleaded with particularity." *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir. 1990) ("Although states of mind may be pleaded generally under Fed.R.Civ.P. 9(b), the rule requires plaintiffs to plead 'with particularity' any 'circumstances constituting fraud.'"). Gengler alleges that, "[w]hen Defendants made the aforementioned uniform and material representations, they knew or should have known those representations to be false and they willfully, wantonly, and recklessly disregarded whether the representations were true." Compl. ¶ 195. But such a conclusory assertion of scienter is simply not enough to satisfy Rules 8 and 9(b). Rather, to satisfy even Rule 8, the assertion must be supported by facts that make the assertion plausible. *See, e.g.*, *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015) ("conclusory assertions" insufficient to state investment-related fraud-by-omission claim); *Robin*, 915 F.2d 1120 at 1127 ("Plaintiffs' claims that Arthur Young should have known that the prospectus was false and misleading also fail to allege scienter. While reckless conduct may satisfy the scienter requirement, bare allegations that Arthur Young should have known or that its knowledge was due to a reckless disregard of the truth are not sufficient . . . ."); *see also Christiansen v. W. Branch Cmty. Sch. Dist.*, 674 F.3d 927, 938 (8th Cir. 2012) ("[T]he basis of [Christiansen's] claim is that H.M.K. made a false

accusation against Christiansen and, as alleged in the complaint, the West Branch defendants 'knew or should have known [H.M.K.'s accusations] were false and deceptive' when West Branch terminated Christiansen. While Christiansen contends that this 'knew or should have known' allegation is a fact entitled to an assumption of truth, *Iqbal* counsels otherwise.").[14]

Equally fatal to the common-law fraud claims is that Gengler appears to rest both on the wrong assumption that Defendants had a duty to disclose. For example, he asserts that Defendants "fraudulently conceal[ed] and/or intentionally fail[ed] to disclose." Compl. ¶¶ 204-05. But this theory requires a duty to disclose. *See Tietsworth*, 2004 WI 32, ¶12 (subjecting "failed to disclose or concealed" allegation to the rule that "[i]t is well-established that a nondisclosure is not actionable as a misrepresentation tort unless there is a duty to disclose"); *Laehn Coal & Wood Co. v. Koehler*, 267 Wis. 297, 300-01 (1954).

And no court applying Wisconsin law, nor any court in any case recorded by Westlaw, has ever imposed a duty to disclose on a building-products manufacturer as to a consumer, and to do so here would require impermissibly expanding the scope of Wisconsin's duty to disclose. *Cf. Kennedy v. MI Windows & Doors, Inc.*, No. 2:12-CV-2305-DCN, 2013 WL 267853, at *4 (D.S.C. Jan. 24, 2013) (applying Illinois law) (dismissing nondisclosure-based fraud claims against window manufacturer based on absence of factual basis for imposing duty to disclose).

"The existence and scope of a duty to disclose are questions of law for the court." *Tietsworth*, 2004 WI 32, ¶14. "The usual rule is that there is no duty to disclose in an arm's-length transaction." *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 15, 283 Wis. 2d

---

[14] On this basis, courts routinely dismiss fraud claims. *See, e.g., Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 620 (2d Cir. 2009); *Ryden v. Tomberlin Auto. Grp.*, No. 1:11-CV-1215-RLY-DML, 2012 WL 4470266, at *4 (S.D. Ind. Sept. 27, 2012) ("[W]hile Plaintiff broadly alleges that Kenda knew that his Vehicle was defective, he pleads no facts to support that allegation."); *Meserole v. Sony Corp. of Am.*, No. 08 CV. 8987 (RPP), 2009 WL 1403933, at *8 (S.D.N.Y. May 19, 2009) ("Simply put, beyond Plaintiffs' bare-boned allegation that Sony was aware of the Defect when the Televisions were sold, the Complaint puts forth no facts providing a plausible basis for inferring that Defendants knew of the Defect prior to the sale of the Televisions here.").

555, 571. The Wisconsin Supreme Court has, in "a narrow holding," held that "a subdivider-vendor of a residential lot has a duty to a non-commercial purchaser to disclose facts which are known to the vendor, which are material to the transaction, and which are not readily discernible to the purchaser." *Tietsworth*, 2004 WI 32, ¶14 (quotation omitted). But the court has noted that this "narrow holding" was "premised on certain policy considerations present in non-commercial real estate transactions." *Id.* (quotation omitted).

To date, the Wisconsin Supreme Court has never extended this "narrow holding" "more broadly to sales of consumer goods," which would involve "a significant common-law policy issue." *See id.* And it is for that court (and not a federal court) to decide this significant policy issue under Wisconsin's common law. *See Eberts v. Goderstad*, 569 F.3d 757, 766 n.9 (7th Cir. 2009) (noting *Tietsworth* and declining to "speculate here about whether the Wisconsin Supreme Court is likely to recognize a claim of negligent misrepresentation based on nondisclosure").

Therefore, Gengler's tort claims must be dismissed.

**III.    The WDTPA claim (Count V) must be dismissed because it is barred by the three-year statute of repose, is based on alleged nondisclosures, and is insufficiently pled.**

**A.    The three-year statute of repose bars this claim, which accrued no later than 2004 and expired no later than 2007, long before this 2016 lawsuit.**

Gengler's WDTPA claim is based on Wis. Stat. § 100.18. Compl. ¶ 173. This statute is subject to a three-year statute of repose, under which "[n]o action may be commenced under this section more than 3 years after the occurrence of the unlawful act or practice which is the subject of the action." Wis. Stat. § 100.18(11)(b)3. This "is a statute of repose" because it begins running "*regardless of whether the plaintiff has discovered the injury or wrongdoing.*" *Kain v. Bluemound E. Indus. Park, Inc.*, 2001 WI App 230, ¶¶ 14-15, 248 Wis. 2d 172, 181-82 (emphasis in original) (quotation omitted).

And here, that three-year period expired long ago. The alleged "unlawful act or practice which is the subject of the action" is various alleged representations allegedly made by "Defendants" or their representatives to Gengler before his 2004 purchase of the windows. Compl. ¶¶ 64, 67, 177-78. The three-year period thus began running no later than the end of 2004, and expired no later than late 2007. Almost a decade passed before Gengler filed this 2016 lawsuit. Thus, the statute bars Gengler's claim. *See Selzer v. Brunsell Bros.*, 2002 WI App 232, ¶ 29, 257 Wis. 2d 809, 829-30 ("By the plain terms of this statute, Selzer's cause of action accrued in 1988 when Marvin[, the window manufacturer,] provided his architect the catalog containing the allegedly false representation, and his statutory claim expired three years later in 1991. This is so regardless of whether Selzer knew of his injury by 1991.").

There is no exception to this statute of repose. Gengler would like it to be otherwise, arguing that Defendants should be equitably estopped from relying on it, based on his allegation that Defendants, by concealment, prevented him from "discover[ing]" a defect. Compl. ¶¶ 90-100. This argument has three flaws. First, in reality, Gengler is making a fraudulent concealment argument, not an equitable estoppel argument; as such, the argument fails, because fraudulent concealment cannot toll a statutory period that is not subject to the discovery rule:

> Equitable estoppel in the limitations setting is sometimes called fraudulent concealment, but must not be confused with efforts by a defendant in a fraud case to conceal the fraud. To the extent that such efforts succeed, they postpone the date of accrual by preventing the plaintiff from discovering that he is a victim of a fraud. They are thus within the domain of the discovery rule. Fraudulent concealment in the law of limitations presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant— above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time.

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) (citation omitted).

Second, even if Gengler were making an estoppel argument, it would fail as a matter of

law because he does not plead that Defendants took any steps to, between the 2004 accrual and the 2007 expiration of the statutory period, "prevent the plaintiff from suing in time." *See id.* at 450-51 ("[E]quitable estoppel . . . comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations.").

Third, permitting Gengler to prevail on either ground would be contrary to what the Wisconsin Legislature required when it enacted the statute of repose and contrary to well-established Wisconsin law. *See Selzer*, 2002 WI App 232, ¶30 (rejecting Selzer's argument "that 'public policy considerations' require that his [WDTPA] cause of action should be deemed to have accrued when he discovered the window rot," because the Legislature had spoken).

Therefore, the three-year statute of repose bars the WDTPA claim.

**B. The WDTPA claim must also be dismissed because Gengler bases it on nondisclosures, which are not actionable under the WDTPA.**

Gengler's WDTPA theory is that Defendants' alleged "nondisclosure" injured him: "As a direct and proximate cause of the violation of the DTPA, described above, Plaintiff and members of the Class have been injured in that they have purchased homes or other structures with the defective Windows based on nondisclosure of material facts alleged above." Compl. ¶ 186.

But section 100.18 "requires an affirmative statement, and is not violated by a failure to disclose a known defect." *Ball v. Sony Elecs. Inc.*, No. 05-C-307-S, 2005 WL 2406145, at *2 (W.D. Wis. Sept. 28, 2005) (citing *Tietsworth*, 2004 WI 32, ¶45 ("[B]ecause a nondisclosure is not an 'assertion, representation or statement of fact' for purposes of the DTPA, and because the only affirmative assertions alleged in the amended complaint are mere puffery, the plaintiffs have failed to state a claim under Wis. Stat. § 100.18.")). The *Caterpillar* case is on point. *In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*, No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *39 (D.N.J. July 29, 2015) ("Plaintiffs' consumer protection claims in the instant

action are premised on an omission or a failure to disclose a known defect. Such a claim is not permitted under the DTPA as plainly articulated by the Wisconsin Supreme Court.").

At times, Gengler alleges misrepresentations as to the windows being of "superior quality," "compliant with building codes," and compliant with "industry and testing standards." Compl. ¶ 178. But the alleged "superior quality" representations is puffery that cannot support a WDTPA claim. *See Tietsworth*, 2004 WI 32, ¶42 ("[P]uffery[ is] insufficient to state a claim under the DTPA," and "'[p]remium quality' . . . is squarely within the puffery definition.") (quotation omitted). As for the alleged compliance representations, Gengler provides no indication that they deceived him into buying Windsor windows. Rather, Gengler makes clear that it is his theory that Defendants' alleged "nondisclosure" of a defect in the windows that was the "direct and proximate cause" of his alleged damages. *See* Compl. ¶¶ 177, 186.

Therefore, because Gengler bases his WDTPA claim on nondisclosure, his claim must be dismissed. This reason for dismissal is in addition to the reason that the claim is time barred.

**IV. The implied warranty claim (Count II) must be dismissed because it is barred by the six-year statute of limitations and the Pinnacle warranty's disclaimer.**

**A. The six-year statute of limitations bars this claim because it began running when Gengler bought the windows in 2004, and expired long before this 2016 action.**

Gengler alleges that he, and not his builder bought the windows that were eventually installed in his home. Compl. ¶¶ 64, 115. Assuming this to be true, that transaction was governed by Article 2 of Wisconsin's version of the Uniform Commercial Code ("UCC"), and subject to the implied warranty of merchantability, which arises under Article 2. Wis. Stat. § 402.314.

"A warranty action must be commenced within six years after the 'cause of action has accrued.'" *Selzer*, 2002 WI App 232, ¶16 (quoting Wis. Stat. § 402.725(1)). Implied warranty claims accrue "at the time of delivery of the goods." *Id.* (citing Wis. Stat. § 402.725(2)).

Thus, Gengler's implied warranty claim accrued when the windows were delivered (in 2004) and expired six years later (in 2010), six years before Gengler commenced this action; the implied warranty claim is therefore time-barred. *See id.* ("Selzer's implied warranty claim accrued upon the delivery of the windows by at the latest 1990, and the limitation period elapsed six years later in 1996. Accordingly, we also affirm the dismissal of this claim as time-barred.").

Gender asserts that, because of the way that Windsor manufactured the windows, it concealed a "defect" (a "defect" he has not plausibly pleaded) and should be equitably estopped from raising a statute-of-limitations defense. Compl. ¶¶ 90-100. This argument has three problems, which are essentially the same three problems with his challenge to the WDTPA's statute of repose. *See, supra,* Sec. III.A; *see Selzer*, 2002 WI App 232, ¶24 n.8 ("Selzer argues that this result runs afoul of sound public policy, but Wisconsin courts have consistently held that the legislature is the proper entity to address concerns regarding the policies underlying statutes of limitation."); *Haley v. Kolbe & Kolbe Millwork Co.*, No. 14-CV-99-BBC, 2015 WL 9255571, at *11 (W.D. Wis. Dec. 18, 2015) (Crabb, J.) ("The discovery rule does not apply to claims for the breach of implied warranty because those claims accrue when tender of delivery is made.").

Therefore, the six-year statute of limitations bars the implied warranty claim.

**B.  The windows' Pinnacle warranty's disclaimer bars the implied warranty claim.**

An implied warranty is something the law reads into a contract to save the parties the trouble of having to negotiate an express term; it is an off-the-rack term. If the parties don't like it, if they would prefer to custom-make their own term, they are free to do so, free that is to disclaim the implied warranty.

*Bushendorf v. Freightliner Corp.*, 13 F.3d 1024, 1027 (7th Cir. 1993)(citing UCC § 2-316(3)(a)).

As an initial matter, the Pinnacle warranty provides that "[t]his warranty is governed by the laws of the State of Iowa without regards to choice of law principles." Compl., Ex. B. at p.2, column 3. But this provision has no real impact here, because both Iowa and Wisconsin have

adopted the relevant portions of Article 2 of the UCC that govern here, and which require enforcing the disclaimer. *Cf. Krider Pharmacy & Gifts, Inc. v. Medi-Care Data Sys., Inc.*, 791 F. Supp. 221, 225 (E.D. Wis. 1992) (Reynolds, J.) ("The conclusions on the choice-of-law questions are not worth belaboring, however, because Krider's contract and tort claims would be evaluated virtually identically under the laws of New Jersey or Wisconsin.").

Under Article 2 of the UCC, as adopted by Iowa and Wisconsin, all that a disclaimer of the implied warranty of merchantability needs to do to be enforceable is be a written, "conspicuous" statement that says it is doing so. Iowa Code. § 554.2316(2); Wis. Stat. § 402.316(2). Article 2 defines "conspicuous" terms as including the following:

> (1) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

> (2) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

Iowa Code § 554.1201(2)(j); Wis. Stat. § 401.201(2)(f) (numbering variations); *see L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 571 (7th Cir. 1993) ("In general, a disclaimer is conspicuous if it is in larger print or otherwise appears in contrasting type or color.").[15]

In that light, as a matter of law, the disclaimer of the implied warranty of merchantability is conspicuous, written as it is in purple, capital letters in contrast to the surrounding text, and directly beneath bolded, purple, upper-case letters reading, "**LIMITS OF LIABILITY**":

> **LIMITS OF LIABILITY**
> THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

---

[15] *as amended on denial of reh'g* (Dec. 8, 1993), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (U.S. 2014).

Compl., Ex. B, p. 2, col. 3. This disclaimed the implied warranty. *See, e.g.*, *All-Iowa Contracting Co. v. Linear Dynamics, Inc.*, 296 F. Supp. 2d 969, 980 (N.D. Iowa 2003) (disclaimer was "valid" because "[t]he terms and conditions expressly limit the warranty of merchantability, mention merchantability, and are conspicuous as required by section 554.2316(2)"); *Recreatives, Inc. v. Myers*, 67 Wis. 2d 255, 264-65 (1975) (express warranty effectively disclaimed implied warranty of merchantability by saying, "'There are no warranties which extend beyond the description on the face hereof. No other warranty, whether express or implied, shall exist in connection with the sale or use of any all-terrain vehicle manufactured by Recreatives, Inc.'").

Gengler would like to avoid this disclaimer. Despite basing two Counts on the Pinnacle warranty (Counts I and IV), he argues that "Defendants are estopped from relying on any warranty limitation as a defense." Compl. ¶ 101. In other words, he seeks the benefit of his bargain, without the detriment. Besides this being unfair, three other reasons require its rejection.

### 1. Gengler's equitable estoppel argument fails.

No court, in any jurisdiction, in any decision recorded by Westlaw, has ever applied equitable estoppel to refuse to enforce a warranty limitation or disclaimer. "The traditional elements of equitable estoppel are (1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on that misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel." *Olson v. Bemis Co.*, 800 F.3d 296, 306 (7th Cir. 2015) (quotation omitted). Gengler alleges none of these. In particular, he alleges no misrepresentation, before his 2004 purchase, that would have led him to believe that the Pinnacle warranty did not disclaim implied warranties. *Cf. Derma Pen, LLC v. 4EverYoung Ltd.*, 76 F. Supp. 3d 1308, 1325 (D. Utah 2014) (rejecting equitable estoppel argument because plaintiff alleged no causal connection between a misrepresentation by defendant and the alleged injury).

Gengler is thus similar to the plaintiffs in *Reese*, who, under the banner of equitable estoppel, sought to avoid a manufacturer's warranty's exclusion of coverage for "damage caused by the installation of aftermarket markets." *Reese v. Ford Motor Co.*, 499 F. App'x 163, 168-69 (3d Cir. 2012). The Third Circuit rightly rejected this attempt. *See id.* ("The Reeses have directed us to no words, deeds or representations by Ford on which they reasonably could have relied.").

### 2. Gengler's "fails its essential purpose" argument fails.

Within Gengler's estoppel argument, he refers to the "fails its essential purpose" test, Compl. ¶ 105, but his disclaimer argument has nothing to do with this test because Gengler argues that the *warranty* fails its essential purpose, whereas the test applies only to *remedies*.

Under the test, "[w]here circumstances cause an exclusive or limited **remedy** to fail of its essential purpose, remedy may be had as provided in" Article 2. Iowa Code § 554.2719(2) (emphasis supplied); Wis. Stat. § 402.719(2). The Pinnacle warranty offered a limited remedy of replacement parts, but not if the damage was caused by condensation. Compl., Ex. B. Windsor denied Gengler's warranty claim, because he based it on excluded condensation damage. McMillen Decl. at Ex. 3, 11/25/14 email.

Gengler alleges that the **warranty** fails its essential purpose by "purport[ing] to warrant that the Windows will be free from defects for a prescribed period of time when, in fact, said Windows fall far short of the applicable warranty period." Compl. ¶ 105. But this has nothing to do with whether *the replacement parts remedy* failed its essential purpose. The question is whether "the remedy fails of *its* essential purpose, not of the essential purpose of the Code or of contract law or of justice or of equity." White & Summers, *Uniform Commercial Code* § 12–10, at 523 (3d ed. 1988), *followed by Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.*, 843 F. Supp. 1027, 1042 (D.S.C. 1993) ("[W]hether the limited remedy as provided for by the parties

fails of its purpose, rather than whether the limited remedy constituted appropriate relief or, with hindsight, objectively served the purpose of contract law."), *aff'd,* 46 F.3d 1125 (4th Cir. 1995).

Gengler's "fails its essential purpose" argument is thus entirely misplaced.

### 3. Gengler's unconscionability argument is not plausibly pled.

Gengler asserts that the disclaimer is unconscionable. Compl. ¶ 107. But he has not plausibly pled unconscionability.

"Merely raising the specter of unconscionability is not sufficient to defeat a motion for judgment on the pleadings," or a motion to dismiss. *Jarrett v. Panasonic Corp. of N. Am.*, 8 F. Supp. 3d 1074, 1082 (E.D. Ark. 2013) (collecting cases). "For a contract or a contract provision to be declared invalid as unconscionable, the contract or contract provision must be determined to be both procedurally and substantively unconscionable." *Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 29, 290 Wis. 2d 514, 532; *accord In re Marriage of Shanks*, 758 N.W.2d 506, 515 (Iowa 2008). When, as here, unconscionability is not plausibly alleged, the disclaimer must be enforced, and the implied warranty claims dismissed. That is precisely what happened in *Gregory* and *Jarrett. St. Gregory Cathedral Sch. v. LG Elecs., Inc.*, No. 6:12-CV-739, 2014 WL 979196, at *7 (E.D. Tex. Mar. 5, 2014) ("Plaintiffs failed to adequately plead facts that if true give rise to a plausible inference of unconscionability"); *Jarrett*, 8 F.Supp.3d at 1082 ("Plaintiff does not dispute that the disclaimer complies with the Arkansas UCC and she has not pled facts suggesting that the disclaimer is nevertheless procedurally or substantive unconscionable").

Sprinkled throughout Gengler's Complaint are various cursory and conclusory references to different parts of the Pinnacle warranty being "unconscionable." Compl. ¶¶ 46-48, 107, 126, 133. But nowhere does Gengler state a factual basis for a plausible unconscionability claim directed at the disclaimer of implied warranties, whether procedurally or substantively.

Procedural unconscionability requires "the absence of meaningful choice on the part of one of the parties." *Wisconsin Auto*, 2006 WI 53, ¶32; *accord In re Shanks*, 758 N.W.2d at 515. But no one forced Gengler to buy Windsor windows, subject to the disclaimer of implied warranties. To the contrary, Gengler's Complaint reflects that he had the time to make a free, thoughtful, and un-coerced choice. He "worked for a local lumberyard where he diligently searched for and reviewed many different window manufacturers' literature before his purchase." Compl. ¶ 66. And he apparently toured Windsor's manufacturing facility before his purchase. Compl. ¶ 65. In this light, the Complaint provides no plausible factual basis for concluding that, when Gengler bought the windows, he lacked a meaningful choice. He pleads precisely the opposite! Thus, procedural unconscionability has not been plausibly pled, and this alone requires rejecting the unconscionability argument. *See Sheehan v. Monaco Coach Corp.*, No. 04-C-717, 2006 WL 208689, at *11 (E.D. Wis. Jan. 25, 2006) (Callahan, M. J.) (rejecting procedural unconscionability argument, reasoning, *"*[I]f the Sheehans would have read the warranty at or before the time of sale, and had decided that they did not approve of the consequential damages disclaimer, they could have looked into buying a different brand of motor home. Thus, this court finds that the evidence falls short of showing procedural unconscionability, and therefore, need not discuss substantive unconscionability.").

Substantive unconscionability requires "contract terms that are unreasonably favorable to the other party." *Wisconsin Auto*, 2006 WI 53, ¶32; *accord In re Shanks*, 758 N.W.2d at 515. But the Pinnacle disclaimer of implied warranties is not that; rather, it is nothing more than a conspicuous, garden-variety disclaimer of implied warranties, which complies with the UCC. *See* Iowa Code § 554.2316(2); Wis. Stat. § 402.316(2); *All-Iowa*, 296 F. Supp. 2d at 980.

Gengler alleges that "Defendants had the exclusive knowledge of the defects alleged herein, and otherwise failed to disclose the defects or actively concealed the problems with their Windows." Compl. ¶ 46. But courts have repeatedly rejected the proposition that "the *terms* of a warranty are necessarily substantively unconscionable solely because one party conceals certain information during the bargaining process." *Hart v. Louisiana-Pac. Corp.*, ___ Fed.Appx. ___, ___, 2016 WL 908878, at *6 (4th Cir. Mar. 10, 2016) (collecting cases under Georgia, California, Florida, Illinois, and Virginia law). Such an allegation *may* be relevant to the *procedural* unconscionability inquiry, but only if there is "some link between the defect and the objective unfairness of the warranty terms." *Id.* at *7 (collecting cases). And here, there is none.

Therefore, the implied-warranty claim must be dismissed under (1) the six-year statute of limitations and (2) the conspicuous disclaimer of implied warranties.

## V. The express warranty and contract claims (Counts I and IV) must be dismissed because the condensation damage Gengler pleaded is excluded from the warranty.

Gengler's express warranty and breach of contract claims, although pled as separate Counts, are simply alternative articulations of the same claim. *See Martin v. LG Electronics USA, Inc.*, No. 14-CV-83-JDP, 2015 WL 1486517, at *8 (W.D. Wis. Mar. 31, 2015) (Peterson, J.) ("A warranty is an express contract."). These claims fail under the terms of the warranty.

The express warranty, which Gengler attached to his Complaint, expressly excludes from the warranty's coverage "[d]amage caused by . . . [c]ondensation." Compl., Ex. B, Exclusion #3.d. And the Complaint leaves no plausible doubt that he is seeking only damages caused by condensation. Compl. ¶¶ 69-73 & Ex. A. For example, the Complaint refers to his complaint about "extreme condensation on all of his windows, causing mold and water staining" (Compl. ¶ 73), and, in the November 20, 2014 email to Windsor that he attached to his Complaint, he refers to his warranty claim as being about "this condensation issue" (Compl., Ex. A at 2).

To avoid this outcome, Gengler asserts that, in reality, the condensation is not causing the alleged damage (despite his and Windsor's belief), but rather that some defect in the window is. Compl. ¶ 79. But he has failed to allege a plausible factual basis for this alternative theory.

"A touchstone of a satisfactory complaint is plausible suggestion of, not mere consistency with, the alleged wrongdoing." *See Dixon v. Ladish Co.*, 785 F. Supp. 2d 746, 748 (E.D. Wis. 2011) (Stadtmueller, J.), *aff'd sub nom. Dixon v. ATI Ladish LLC*, 667 F.3d 891 (7th Cir. 2012). For this reason, "[i]f the allegations give rise to an obvious alternative explanation, then the complaint may stop short of the line between possibility and plausibility of entitlement to relief." *Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014) (quotation omitted).

Consider the facts pleaded by Gengler, including those incorporated by reference.

- Before Windsor denied Gengler's warranty claim in 2014, Gengler described his problem as involving "condensation on ALL windows" (in his November 18 Web Request) and "this condensation issue" (in his November 20 email to Betty Deemer). (Compl., Ex. A.)

- The Care and Use Guide stated that "[c]ondensation on your windows could be an indicator that other moisture problems could develop, including mold or mildew on cold exterior wall surfaces, peeling paint, wood rot and the failure of wall insulation." McMillen Decl., Ex. 2, 2012 Care and Use Guide at 6. Those are precisely the damages alleged. Compl. ¶¶ 73, 78.

- The Guide stated that indoor window condensation is caused by indoor humidity (corroborated by the other sources cited by Deemer in her 2014 emails); it recommended "winter humidity levels" of never more than 35% (and lower levels when temperatures dip beneath 10°F); and it cautioned that these are only "recommended humidity levels, and may not be applicable for every household . . . . If your windows begin to sweat, the humidity in your home is too high." McMillen Decl., Ex. 2, Care and Use Guide, at 7. But Gengler never tried to reduce his winter humidity levels below 35%. Compl., Ex. A, 11/20/2014 email.

Gengler now argues that some mysterious, non-humidity-related condensation-causing defect is to blame. But he has offered zero factual support for this alternative theory, and it flies in the face of the unified message of all of the materials with which Deemer supplied him: condensation comes not from leaky windows, but is rather what science gives us when you have the right mixtures of temperatures and indoor humidity. *See, supra,* "FACTS" section.

Gengler's unsupported about-face assertion in the Complaint that his problem is not condensation but an unspecified window defect is a prototype of the kind of conclusory assertion contradicted by factual pleading that the U.S. Supreme Court has directed must be rejected. *See Iqbal*, 556 U.S. at 677-78 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.") (quotation omitted); *Corwin v. Connecticut Valley Arms, Inc.*, 74 F. Supp. 3d 883, 889 (N.D. Ill. 2014) ("An assertion that the bullet was 'defective,' without any factual elaboration, is insufficient, as that statement is a 'legal conclusion couched as a factual allegation.'") (quoting *Iqbal,* 556 U.S. at 678); *Biorn v. Wright Med. Tech., Inc.*, No. 2:15-CV-07102-CAS-KS, 2015 WL 7428514, at *4 (C.D. Cal. Nov. 19, 2015); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, 754 F. Supp. 2d 1208, 1220 (C.D. Cal. 2010) ("A bare allegation that the product suffered from a 'design defect' is an insufficient legal conclusion under *Twombly* and *Iqbal*."); *Ball v. Takeda Pharm. Am., Inc.*, 963 F. Supp. 2d 497, 505 (E.D. Va. 2013) ("A bare allegation of a 'defect' is no more than a legal conclusion."), *aff'd,* 587 F. App'x 78 (4th Cir. 2014).

The Wisconsin Court of Appeals' recent *Goldberg* decision is remarkably instructive, in its affirmance of dismissal of a warranty claim against a window manufacturer. There, plaintiff-homebuyers (Goldbergs) sued the manufacturer, Pella, and the homesellers (DiMaggios). *Goldberg*, 2015 WI App 68, ¶1. Pella had previously denied the Goldbergs' warranty claim, which they based on their windows "exhibiting condensation that resulted in icing and frosting." *Id.* at ¶2. The Goldbergs sued Pella for breach of warranty, and the DiMaggios for "failing to disclose the condensation problem prior to Goldbergs purchasing the home." *Id.* at ¶3. Post-trial, the circuit court granted Pella's motion to dismiss, but denied the DiMaggios' motion to dismiss. *Id.* at ¶4. On appeal, the court of appeals rejected the Goldbergs' argument that these rulings

were "inconsistent." *Id.* at ¶¶15-16. It reasoned that the basis for denying the motion against the DiMaggios was that "the condensation itself was a 'defect' of the house," whereas the basis for granting Pella's motion was that the Goldbergs had failed to establish a prima facie case that the condensation "resulted from a 'defect' in the Pella products as opposed to some other condition of the house." *Id.* at ¶16.

Gengler's situation is analogous to the Goldbergs'. Gengler based his warranty claim not on a defect in the windows, but on, at worst, a "defect" in his home's humidity levels. He asserts in conclusory fashion that some mysterious condensation-causing window defect is what actually caused his damage. But he has alleged zero factual basis to plausibly support this alternative theory. And, under *Twombly, Iqbal*, and common sense, just because he says it "does not make it so." *Pierce v. Zoetis, Inc.*, ___ F.3d. ___, ___, 2016 WL 1015130, at \*5 (7th Cir. Mar. 15, 2016) (affirming dismissal, citing *Twombly* and *Iqbal*) ("But calling Heuchert's statements 'injurious' and stating that they damaged her business relationships does not make it so.").

Therefore, the express warranty and contract claims must be dismissed.[16]

## VI. The MMWA claim (Count III) must be dismissed for the same reasons that the express and implied warranty claims (Counts I, II, and IV) must be dismissed.

The Magnuson Moss Warranty Act ("MMWA") "provides a federal private cause of action for a warrantor's failure to comply with the terms of a 'written warranty, implied warranty or service contract.'" *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 780 (7th Cir. 2011) (quoting 15 U.S.C. § 2310(d)(1)) (other quotation omitted). As such, Gengler's MMWA claim must be dismissed for the same reasons that Gengler's other warranty claims must be dismissed. *See id.* at 781 ("The MMWA allows the Andersons to bring federal claims premised on state law

---

[16] Moreover, even if this warranty claim survived this motion, it would be insufficient to warrant certifying a class, as Judge Crabb recently observed. *Haley v. Kolbe & Kolbe Millwork Co.*, No. 14-CV-99-BBC, 2015 WL 6828751 (W.D. Wis. Nov. 6, 2015) (in a case involving question of window condensation, declining to certify defect class; "the actual cause of rot in each of the class member's windows requires individual analysis and proof").

violations," and it "operates as a gloss on the Anderson's state law breach of warranty claims.").

Moreover, even if the express warranty claim somehow survived, the MMWA remedies available for it would be limited, because the Pinnacle *Limited* 20/10 Warranty in Exhibit B to the Complaint is a limited warranty. *See Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004) (warranties that are "limited" are "not subject to the Act's substantive remedies").

## VII. The declaratory and injunctive-relief claim (Count IX) must be dismissed.

Gengler requests declaratory and injunctive relief under 28 U.S.C. § 2201(a). Compl. ¶ 227. His request must be denied for three reasons.

First, the statute authorizes only *declaratory* relief, not the expansive *injunctive* relief requested by Gengler.[17] It vests this Court with the authority only to "declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C.§ 2201(a); *see Steffel v. Thompson*, 415 U.S. 452, 471 (1974) ("[E]ven though a declaratory judgment has 'the force and effect of a final judgment,' 28 U.S.C. s 2201, it is a much milder form of relief than an injunction. Though it may be persuasive, it is not ultimately coercive; noncompliance with it may be inappropriate, but is not contempt.") (quotation omitted); *Deveraux v. City of Chicago*, 14 F.3d 328, 331 (7th Cir. 1994) ("[B]ecause nothing in the declaratory judgment plaintiffs seek would bind the City or alter the legal relationship of the parties, we conclude that the district court properly dismissed plaintiffs' action for failure to allege a case or controversy.").

Second, Gengler is seeking a declaration as to *the past*, not *the future*. For example, he seeks a declaration that windows previously sold "contain material defects." Compl. ¶ 229. But the statute authorizes a declaration only of the rights and relations "that will govern the parties' relationship *in the future*," *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 711 (7th Cir. 2002)

---

[17] Gengler would like this Court to order Windsor to "issu[e] a recall, replacement, or retrofit of the windows to address the defects; issu[e] warnings or notices to consumer[s] regarding the risk of property; and immediately [dis]continu[e] the manufacture, sale, and distribution of the defective Windows." Compl. ¶ 234.

(emphasis added), as "[t]he purpose of a declaratory judgment is to allow the parties to understand their rights and liabilities *so that they can adjust their future action to avoid unnecessary damages*," *Rockwell Int'l Corp. v. IU Int'l Corp.*, 702 F. Supp. 1384, 1388 (N.D. Ill. 1988) (emphasis added). As Judge Adelman recently reasoned:

> I conclude that this is not an appropriate case for declaratory relief. There are no ongoing violations of federal law, CFACT cannot recover damages for any violations that may have occurred in the past, and I do not see any way in which a declaratory judgment could serve a useful purpose (such as removing a cloud of uncertainty from over the plaintiff's rights).

*Collegians for a Constructive Tomorrow-Madison v. Regents of Univ. of Wisconsin Sys.*, 820 F. Supp. 2d 932, 952 (W.D. Wis. 2011).

Third, because Gengler's eight substantive counts must be dismissed, this procedural request for relief cannot stand and must also be dismissed. "Although Congress has authorized courts to issue declaratory relief in some cases, this authority is merely procedural. The constitutional requirement of a justiciable case or controversy remains applicable." *Cornucopia Inst. v. U.S. Dep't of Agric.*, 560 F.3d 673, 676 (7th Cir. 2009) (citation omitted). When all of a plaintiff's "substantive claims" are dismissed, "[i]t necessarily follows that his claim[] for declaratory relief . . . [be] dismissed." *Johnson v. Shemonic*, No. CIV.10-071-GPM, 2010 WL 3894019, at *5 (S.D. Ill. Sept. 30, 2010); *see Ferguson-Kubly Indus. Servs., Inc. v. Circle Envtl., Inc.*, 409 F. Supp. 2d 1072, 1081 (E.D. Wis. 2006) (Randa, C.J.) ("A request for declaratory judgment is a procedural mechanism that relies, in this instance, upon substantive state law.").

## <u>CONCLUSION</u>

Defendants respectfully ask this Court to grant their motion, and to order Gengler to pay for Defendants costs and disbursements.

**MICHAEL BEST & FRIEDRICH LLP**

By: *s/Joseph L. Olson*
      Paul E. Benson, SBN 1001457
      Joseph L. Olson, SBN 1046162
      100 East Wisconsin Avenue, Suite 3300
      Milwaukee, WI 53202-4108
      P: 414.271.6560
      F: 414.277.0656
      pebenson@michaelbest.com
      jlolson@michaelbest.com

ARTHUR, CHAPMAN,
KETTERING, SMETAK &
PIKALA, P.A.
Michael P. North (MN #230716)
Sarah E. Bushnell (MN #326859)
Jeffrey M. Markowitz (MN #391959)
500 Young Quinlan Building
81 South Ninth Street
Minneapolis, MN 55402-3214
P: (612) 339-3500
F: (612) 339-7655
mpnorth@ArthurChapman.com
sebushnell@ArthurChapman.com
jmmarkowitz@ArthurChapman.com
(Admissions to be Sought)

*Attorneys for Defendants*
*Windsor Window Company d/b/a Windsor*
*Windows and Doors, and Woodgrain*
*Millwork, Inc.*

209265-0002\18780453.1