**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
(MILWAUKEE DIVISION)**

| | |
|---|---|
| SHAWN S. GENGLER, *on behalf of himself and all others similarly situated*, | Case No. 2:16-cv-00180 |
| Plaintiff, | Hon. Lynn S. Adelman |
| v. | **PLAINTIFF'S OPPOSITION TO WINDSOR AND WOODGRAIN'S MOTION TO DISMISS COMPLAINT** |
| WINDSOR WINDOW COMPANY d/b/a WINDSOR WINDOWS AND DOORS, and WOODGRAIN MILLWORK, INC., | |
| Defendant. | |

Shawn Gengler built a new home in Muskego, Wisconsin, in 2004. A worker for a local lumberyard, Mr. Gengler diligently reviewed literature from many different window manufacturers, and even toured Windsor's[1] Iowa manufacturing plant, before making a decision to install Windsor windows in his home. But unknown to Mr. Gengler, the windows contained defects existing at the time they left the factory that caused them to deteriorate, rot, and damage the drywall, trim, and other areas of his home. When Mr. Gengler called Windsor to complain, Windsor *assumed* that it was Mr. Gengler's fault for keeping the humidity in his home too high—without even verifying that this was case by testing or through a service call. In reality, it was not Mr. Gengler's fault: Windsor had already received numerous complaints about its defective windows, and routinely denied warranty claims after shifting the blame to its consumers. The Defendants' should be held responsible for their defective windows, and their motion to dismiss should be denied.

---

[1] References to "Windsor" or "Defendants" include Windsor Window Company and Woodgrain Millwork, Inc.

# I.    RELEVANT FACTS

## A.    Defendants' Windows and the defect.

Windsor Window Company and Woodgrain,[2] Windsor's parent corporation, designed, manufactured, marketed, advertised, warranted, and sold their wood and wood-clad windows ("Window" or "Windows") to Mr. Gengler and consumers and builders in Wisconsin and throughout the United States. Compl. ¶¶ 1, 20, 137.  These Windows were and are defective.  *Id.* ¶¶ 22-27.  As a result of Defendants' design and manufacturing practices, Mr. Gengler and other consumers didn't get the benefit of their bargains because there is a high probability the Windows will fail and it is likely that the Window sashes have already developed wood rot by the time the Windows leave the factory.  *Id.* ¶¶ 17, 23, 25, 69, 83, 143.

The wood rot from the Windows infects the frames and adjoining structures unless repaired and replaced before the rot progresses to those components.  *Id.* ¶ 17.  But consumers cannot *see* the defect–the incipient wood rot is masked by the aluminum cladding of the Windows, and it takes some time for the rot to advance to the stage where it would become visible upon ordinary inspection.  *Id.* ¶¶ 7, 17, 90, 98.  By the time the wood rot advances to that stage, Defendants' limited warranty period has expired and substantial injury already has occurred.  *Id.* ¶ 17.  In addition to the wood rot, the Windows are also defective because they permit water to penetrate the Window components, where the water is then absorbed by the wood members and causes rot, premature degradation, leaking, and ultimately failure of the Windows' basic purpose of keeping out the elements. *Id.* ¶¶ 23, 68.  This occurs well in advance of the expected useful lives of the Windows.  *Id.* ¶ 24.

---

[2] Refers to Woodgrain Millwork, Inc.

The defects cause severe damage to the Windows, other parts of the structure housing the Windows, as well as the homeowners' other property, including other personal property. *Id.* ¶¶ 3, 8, 17, 26.

**B.    Defendants had knowledge of the defect, but misrepresented the true nature of the Windows.**

Defendants hold themselves to both the construction industry and the public at large as providers of superior, quality, and durable construction products, which include the Windows. *Id.* ¶¶ 19, 65, 67. Based on their expertise and experience in window design and manufacturing, Defendants knew or should have known that the defects were present at the time the Windows left their control and that the Windows did not meet industry standards or a consumer's reasonable expectations. *Id.* ¶¶ 31-32, 69. And Defendants were put on further notice of the defects and resultant damage by homeowners across the country who noticed symptoms associated with the Windows' defects. *Id.* ¶¶ 45. But even with that knowledge, Defendants failed to correct the defective design, manufacturing process, or materials used in the Windows. *Id.* ¶¶ 32-33, 232. Instead, Defendants represent and continue to represent in their express warranty and documents available to the public, including on Defendants' website, brochures, and marketing materials, that the Windows are free of defects and will be free of defects for at least 10 years. *Id.* ¶¶ 41, 44, 105.

But because Defendants represent that their Windows are defect-free and of a high quality, and because consumers cannot discover the true defective nature of the Windows upon reasonable inspection, Mr. Gengler and consumers and builders in Wisconsin and throughout the United States are unaware of the defects until the Windows—and any surrounding property—are in the advanced stages of failure. *Id.* ¶¶ 17. Mr. Gengler and the Class members relied on Defendants' representations when they purchased the Windows or structures containing the Windows. *Id.* ¶ 42.

As a result, Defendants had a duty to disclose the true and nature and condition of the Windows—which is material to Mr. Gengler and Class members—based upon Defendants' exclusive knowledge of the defects and their active concealment.  *Id.* ¶¶ 96-97, 100.  But Defendants never warned or notified purchasers of the defects.  *Id.*  ¶¶ 33, 232.

### C.      The uniform, 10-year warranty.

Defendants issue a standard, uniform, 10-year warranty with each Window sold that the Windows will be free from defects for at least 10 years.  *Id.* ¶ 41.  This express warranty, however, contains numerous limitations and exclusions that severely limits coverage and imposes unreasonable demands on homeowners.  *Id.* ¶ 46.  The warranty was not a negotiated contract, and many of its terms are unconscionable and should be unenforceable.  *Id.* ¶¶ 46-47.  Moreover, Defendants have engaged in a pattern and practice of failing to honor or discouraging warranty claims by failing to respond to homeowners, requiring the owner to pay for an inspection of the Windows, and/or requiring the homeowner to pay for all costs associated with repair or replacement of the Windows, including the labor.  *Id.* ¶¶ 50-51.

### D.      Mr. Gengler's experience.

Mr. Gengler built his home in 2004 and decided to purchase Defendants' Pinnacle Series Windsor Windows after touring Defendants' factory and researching and reviewing different manufacturers' literature.  *Id.* ¶¶ 64-66.  When choosing Defendants' Windows over those of their competitors, Mr. Gengler relied on representations made by Defendants and Defendants' representatives that the Windows were of high quality and free from defects.  *Id.* ¶ 67.  At the time the Windows were purchased, Mr. Gengler was unaware that the Windows were defective.  *Id.* ¶ 68.  But in or around 2013, Mr. Gengler began noticing ice and condensation forming on several of his Windows.  *Id.* ¶ 71.  He notified the Defendants, but the Defendants simply

brushed off the moisture problems Mr. Gengler was experiencing as a result of the humidity in his home being too high—without checking the humidity levels in Mr. Gengler's home, or sending a service technician to confirm that the moisture problems were even the result of humidity.  *Id.* ¶ 71.  Mr. Gengler began running dehumidifiers in his home; however, the problem persisted.  *Id.* ¶¶ 72-73.  He reached out to Defendants, again, this time informing the Defendants that his *drywall* had now begun to stain, and asking the Defendants if other individuals had complained about moisture intrusion caused by the Windows.  Def. Br.[3] Ex. 3 at 2.  Rather than seriously investigate the issue, Defendants again concluded that Mr. Gengler was experiencing problems related to the humidity in his home, and did not answer whether other consumers were experiencing similar problems.  *Id.* at 1.  Mr. Gengler tried to explain that he believed the damage was caused by a possible seal issue (Compl. Ex. A), but Defendants considered the matter closed, and denied his warranty claim—without ever confirming that humidity was *actually* the problem.  Def. Br. Ex. 3 at 1.

## II.     ARGUMENT

### A.     Standard of review.

"To survive a Rule 12(b)(6) motion, a complaint must 'state a claim to relief that is plausible on its face.'"  *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 85 F. Supp. 3d 1007, 1009 (E.D. Wis. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must "accept the complaint's factual allegations as true, but allegations in the form of legal conclusions are insufficient."  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

---

[3] Refers to the memorandum in support of Defendants' motion to dismiss, ECF No. 11.

### B.    The economic loss doctrine is inapplicable to the tort-based claims.

Under Wisconsin law, "[t]he economic loss doctrine precludes a purchaser of a product from employing negligence or strict liability theories to recover from the product's manufacturer loss which is solely economic." *Wausau Tile, Inc. v. Cty. Concrete Corp.*, 226 Wis. 2d 235, 245-46, 593 N.W.2d 445, 451 (1999). "Economic loss is the loss in a product's value which occurs because the product 'is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" *Id.* But "[t]he economic loss doctrine does not preclude a product purchaser's claims of personal injury or damage to property other than the product itself." *Id.*, 226 Wis. 2d at 247, 593 N.W.2d at 451.

But Mr. Gengler is not bringing this lawsuit to recover damage to only the Windows, themselves. His Complaint *specifically alleges* that the defective Windows caused damage to "other property" (Compl. ¶¶ 26, 68), "the wall cavity, trim, framing, drywall, and other property in the home" (*id*. ¶¶ 17, 79), and "adjacent building components including drywall and trim." *Id.* ¶ 70. That is, Mr. Gengler alleges damages "other than the product itself." The allegations of damage to "other personal property" are sufficient to overcome the economic loss doctrine at the pleadings stage under Wisconsin law, which is evident from the authorities Defendants cite. *See, e.g.*, *Naparala v. Pella Corp.*, 106 F. Supp. 3d 715, 722-23 (D.S.C. May 19, 2015) (applying Wisconsin law and stating that, "[i]n a similar multidistrict litigation involving windows, this court determined that allegations of damage to 'other property' were 'too vague' to survive the economic loss rule, while allegations of damage to 'other personal property,' although 'by no means highly detailed,' properly stated a claim for negligence"); *Walters v. Pella Corp.*, No. 2:14-CV-00544-DCN, 2015 U.S. Dist. LEXIS 65032, at *24 (D.S.C. May 19, 2015) (same).

Besides *Naparala* and *Walters*, which found that allegations of damage to other property were sufficient to overcome the economic loss rule as noted above,[4] the authorities Defendants cite are not pertinent. The Wisconsin Supreme Court and Court of Appeals in *Linden v. Cascade Stone Co.*, 2005 WI 113, 283 Wis. 2d 606, 699 N.W.2d 189, *Midland Builders, Inc. v. Semling-Menke Co.*, 2005 WI App 193, 287 Wis. 2d 132, 703 N.W.2d 383 (unpublished), and *Bay Breeze Condo. Ass'n, Inc. v. Norco Windows, Inc.*, 2002 WI App 205, 257 Wis. 2d 511, 651 N.W.2d 738, discussed the applicability of the "integrated systems" rule, where the "defective 'component' at issue is predominantly services provided by a subcontractor in a mixed contract." *Linden*, 2005 WI 113, ¶ 26, 283 Wis. 2d at 623, 699 N.W.2d at 197; *see Midland Builders, Inc.,* 2005 WI App 193, ¶ 30; *Bay Breeze Condo. Ass'n, Inc.*, 2002 WI App 205, ¶ 28, 257 Wis. 2d at 528, 651 N.W.2d at 746. Here, Defendants do not, because they cannot, assert that the "other personal property" that the Windows have damaged falls under the "integrated system" rule. This is because the "other personal property" is distinct from and not a part of the house, *i.e.* the "integrated system." *See* Compl. ¶ 68 ("Unknown to Mr. Gengler, the Windows were defective in that they allowed moisture, water, and air to penetrate through the Window components, causing condensation, leaks, and premature wood deterioration *and damage to other property*." (emphasis added)).[5]

---

[4] *See also In re: MI Windows & Doors, Inc. Products Liab. Litig.*, 908 F. Supp. 2d 720, 726 n.2 (D.S.C. 2012); (stating that while "allegations [of damage to 'other personal property'] are by no means highly detailed, they sufficiently notify [defendant] as to the specific category of loss allegedly suffered by the plaintiffs," and are not "barred by the economic loss rule").

[5] The ambiguity that existed in the *In re Atlas Roofing Corp. Chalet Shingle Products Liab. Litig.*, 22 F. Supp. 3d 1322 (N.D. Ga. 2014), *In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Products Liab. Litig.*, No. 8:11-CV-02926-JMC, 2013 WL 1282219 (D.S.C. Mar. 27, 2013), and *S & C Bank v. Wisconsin Cmty. Bank*, 2008 WI App 51, ¶ 21, 309 Wis. 2d 233, 747 N.W.2d 527 (unpublished), as to "other property" simply does not exist here, as Mr. Gengler gave specific examples of damage to other property throughout his Complaint. Indeed, should the Court require clarity of additional property of Mr. Gengler's that was ruined, he would be

### C. Mr. Gengler's fraud-based claims are sufficiently pleaded pursuant to 9(b) and establish that Defendants' had a duty to disclose.

Defendants' argument[6] that the Complaint's allegations fail to meet Rule 9(b) and accusation that the claims are nothing more than a "defamatory and extortionate" attempt at class settlement are baseless rhetoric relying on a very selective reading of the Complaint. "While Rule 9(b) does not require a plaintiff to plead facts that if true would show that the defendant's alleged misrepresentations were indeed false, it does require the plaintiff to state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (quotations omitted). "Fraudulent intent may be alleged generally." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012). The Complaint's allegations meet all Rule 9(b)'s requirements to make out claims for fraudulent misrepresentation and fraudulent concealment.

The "who" is obviously the Defendants.[7] *See, e.g.,* Compl. ¶¶ 39, 41, 44, 59, 65-67, 71-72, 109, 118. The "what" is that Defendants, with the intention and effect of deceiving Mr.

---

happy to provide that information in an amended complaint. Additionally, Defendants' citations to *Below v. Norton*, 751 N.W.2d 351 (Wis. 2008) and *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 965 (7th Cir. 2000), for the proposition that the economic loss doctrine generally extends to fraud claims are irrelevant because, as discussed above, the allegations of damages to Mr. Gengler's other property are sufficient to overcome the economic loss doctrine at the pleadings stage. Defendants also cite *Twombly*, 550 U.S. 555, which, of course, does not discuss the sufficiency of allegations of damages to "other property" to survive the economic loss doctrine.

[6] Defendants also argue that Mr. Gengler's WDTPA claim should fail because he does not meet the heightened Rule 9(b) standard; however, as stated herein *infra*, Mr. Gengler has met his burden of pleading.

[7] Defendants' argument about which misrepresentations are attributable to which defendant should also fail, because Defendants, themselves, acknowledge the different role that each plays in the manufacturing process of the windows. Def. Br. at 3, n.2. *Cf. Catalano v. BMW of N.*

Gengler and members of the putative Class, represented that the "Windows will be free from defective materials and workmanship" and "are suitable and free from defects" and failed to disclose and concealed the fact that the Windows were actually defective.[8] *Id.* ¶¶ 17, 41, 44, 46, 99, 109-110. In addition, for the fraudulent misrepresentation claim, Defendants also "falsely represented to Plaintiff, Class Members, purchasers, and consumers in general that the Windows were warranted against defects in material and workmanship when, in fact, the limited warranty was so limited as to prevent and preclude any warranty protection against the known defect in the Windows." *Id.* ¶ 192. The "when" is when Mr. Gengler and the putative Class members and/or their builders and vendors "purchased the Windows and/or structures containing the Windows." *Id.* ¶¶ 42, 46. The "where" is on Defendants' "express warranty and documents available to the public," as well as "their website, brochures and marketing materials." *Id.* ¶¶ 39, 41, 44. Additionally, Defendants made uniform representations through their sales representatives. *Id.* ¶¶ 65-67. And the "how" is by knowingly selling the defective Windows despite knowing of the defects and representing otherwise, which Mr. Gengler and the putative Class members were unaware of at the time the Windows were purchased. *Id.* ¶¶ 42, 44, 46-47, 184-185, 197.

---

*Am., LLC, et al.*, No. 15-cv-4889 (KBF), 2016 U.S. Dist. LEXIS 78901, at **16-17 (S.D.N.Y. 2016) (manufacturer of the product responsible for misrepresentations regarding manufacturing and warrantor of the product responsible for misrepresentations concerning warranty issues).

[8] Defendants misrepresentations are not mere "puffy," as Defendants argue. Def. Br. at 11-12. *See, e.g., In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*, No. 15 C 1364, 2016 U.S. Dist. LEXIS 1841, at **106-108 (N.D. Ill. Jan. 7, 2016) (similar statements found, taken together, to be the types of statements upon which consumers could reasonably rely). And as to Mr. Gengler's allegations of *fraudulent concealment*, those statements are—by their nature—not puffery. *See, e.g., Pappas v. Pella Corp.*, 363 Ill. App. 3d 795, 804 (1st Dist. 2006) (concealment of material facts did not implicate "puffery").

These allegations are more than sufficient to meet the rigors of Rule 9(b)—and the authorities Defendants cite confirm this. In *Wigod*, the Seventh Circuit found that the complaint "satisfie[d]" Rule 9(b) when the plaintiff "identifie[d] the knowing misrepresentation as [the defendant's] statement in the [agreement] that it would offer her a permanent modification if she complied with the terms and conditions of the [agreement]," and "allege[d] that [Defendant] intended that she would act in reliance on promises it made in the [agreement] and that she reasonably did so to her detriment." *Wigod*, 673 F.3d at 569; *see Camasta*, 761 F.3d at 737 ("[w]e do not require that Camasta provide the precise date, time, and location that he saw the advertisement or every word that was included on it"). The Complaint's allegations here, as described above, are comparable.

In contrast, the Seventh Circuit rejected the bare-bone allegations in *Camasta* because it required the plaintiff to allege "something more" than the assertion that "merchandise was offered at 'sale prices.'" 761 F.3d at 737 (quotations omitted). And in *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771 (7th Cir. 1994), the Seventh Circuit noted that, in the context of a Racketeer Influenced and Corrupt Organizations Act claim, it could "see why the district court concluded that, at least with respect to some allegations, [the plaintiff] had not met Rule 9(b)" because the plaintiff "failed to identify with particularity the actors who participated in the various schemes it alleges." *Vicom*, 20 F.3d at 778. Here, as discussed above, Mr. Gengler identifies both Defendants as complicit in the fraud.

Defendants also argue that there are no allegations that Defendants had any duty to disclose. But the Wisconsin Supreme Court in *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, 270 Wis. 2d 146, 677 N.W.2d 233, 239, did not decline to extend this duty to disclose to

sales of consumer goods. Rather, the court simply stated that "it is an open question whether the duty to disclose recognized in [for noncommercial real estate transactions] extends more broadly to sales of consumers goods"; "[b]ut the parties did not brief it, and therefore [the court does] not decide it."[9] *Tietsworth*, 2004 WI 32, ¶ 15, 270 Wis. 2d at 158, 677 N.W.2d at 239. After *Tietsworth*, the Wisconsin Supreme Court held "broadly" in *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, 283 Wis. 2d 555, 699 N.W.2d 205, which Defendants cite, the following:

> [W]e conclude that a party to a business transaction has a duty to disclose a fact where: (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 20, 283 Wis. 2d 555, 573-74, 699 N.W.2d 205, 213. There is no "reason why the same general principles [enunciated in *Kaloti*] would not apply to a consumer transaction." *Schmidt v. Bassett Furniture Indus.*, No. 08-C-1035, 2009 U.S. Dist. LEXIS 103490, at **29-30 n.2 (E.D. Wis. Oct. 20, 2009). Here, the Complaint alleges that: (1) the fact that the Windows were defective is material to Mr. Gengler and members of the putative Class (Compl. ¶¶ 33, 44, 67); (2) Defendants knew that Mr. Gengler and members of the Class were unaware of the defect (*see, e.g., id.* ¶¶ 184-85, 197-99);

---

[9] Regardless of their duty to disclose, Defendants are still liable to Mr. Gengler for their affirmative fraudulent misrepresentations. *See, e.g.*, *Coltman v. Kase*, 2015 WI App 75, ¶ 18, 870 N.W.2d 248 (Wis. App. Aug. 31, 2015) (unpublished) ("The elements of a fraud claim are: (1) a knowingly false representation of fact; (2) made with intent to defraud and for the purpose of inducing another to act upon it; and (3) justifiable reliance upon the false representation, causing injury or damage").

(3) Defendants had exclusive knowledge of the defective nature of the Windows at the time of sale, which Mr. Gengler or Class members, in the exercise of reasonable diligence could not have discovered prior to purchase (*id.* ¶¶ 46, 206); and (4) Defendants would reasonably have been expected to disclose the defect (*id.* ¶182). Thus, based on the allegations, it is clear that Defendants had a duty to disclose the defect. *Id.* ¶¶ 46, 96.

Finally, Defendants, who appear to then acknowledge that *Kaloti Enterprises Inc.* imposes a duty to disclose, argue that a duty to disclose is foreclosed because "no court applying Wisconsin law. . . has ever imposed a duty to disclose on a building-products manufacturer to a consumer." Def. Br. at 14. But Wisconsin law extends the duty to disclose when "it is foreseeable and intended that a fraudulent misrepresentation will be repeated to third parties and acted upon by them," even if the parties "did not speak directly." *State v. Timblin*, 2002 WI App 304, ¶ 31, 259 Wis. 2d 299, 314, 657 N.W.2d 89, 97. Defendants attempt to distinguish the case law based upon the types of materials being sold, but that's not what the law says. Here, it was wholly foreseeable that Defendants' representations and silence regarding the defective nature of the Windows would be repeated to Mr. Gengler and Class members. *See Forst v. SmithKline Beecham Corp.*, 602 F. Supp. 2d 960, 971 (E.D. Wis. 2009) ("It is wholly foreseeable to a drug manufacturer that its prescribing and side effect information will be communicated to and relied upon by patients, even when the drug company only interacts directly with prescribing physicians and not patients"). Defendants had a duty to disclose regardless of whether they were selling building products or other goods.

### C. The Wisconsin deceptive trade practices claims are also sufficiently pleaded.

#### 1. The three-year statute of repose does not bar Mr. Gengler's WDTPA claim.

Windsor next argues that the WDTPA's three-year statute of repose bars Mr. Gengler's WDTPA claim. Wis. Stat. § 100.18(11)(b)3. But Windsor omits that Wisconsin recognizes that "continuing torts" are recognized under the WDTPA, and that Mr. Gengler's allegations, when accepted in the light most favorable to him, establish that Defendants engaged in a continuing course of misconduct. That is, Mr. Gengler can demonstrate that the Defendants "engaged in a continuing course of misconduct" if "one of their acts fell inside the three years prior to filing of this lawsuit." *Werner v. Pittway Corp.*, 90 F. Supp. 2d 1018, 1033 (W.D. Wis. 2000).

Here, Defendants engaged in a practice of deception that began when it misrepresented the true quality of its Windows when they left the factory, and continuing into its denial of warranty claims. In 2013, within the warranty period provided for Mr. Gengler's Windows, he "began noticing ice and condensation forming on the inside of several of his Windows, which was causing the wood to stain. He submitted a claim with Defendants, but was told by Defendants' representative that the damage was condensation induced by Mr. Gengler's failure to maintain the appropriate interior humidity." Compl. ¶ 71. That is, even though Windsor knew its Windows received many claims for the same issues Mr. Gengler was facing, it denied his claim, and concocted a bogus excuse for the defect: the internal humidity in Mr. Gengler's home was too high (even though Windsor never measured the humidity, or tested Mr. Gengler's Windows). *Id.* Thus, Mr. Gengler "continued to believe his Windows were free of defects and began to run dehumidifiers on both floors of the home. He additionally monitored the interior humidity to prevent additional damage from what he believed (based on the representations of Defendants' representatives) was homeowner-induced condensation." *Id.* ¶ 72. Thus, Windsor's

misrepresentations regarding the quality of its Windows continued after Mr. Gengler's purchase in order to dissuade warranty claims. When the "fix" to Windsor's false diagnosis failed to remedy the problem, Mr. Gengler was already outside the warranty period, and the Defendants had successfully and deceptively lulled him into not pursuing his warranty claim. Because Defendants engaged in a continuous scheme of misrepresenting the quality of its Windows and blaming the consumer for any damage caused by those Windows (a practice which it continued with Mr. Gengler until late 2014 and into 2015, Compl. ¶¶ 73-78), the continuing tort is actionable and well within the statute of repose.

> **2.** **The Court should ignore Defendants' mischaracterization of Mr. Gengler's WDTPA claim, which is based upon affirmative fraudulent misrepresentations.**

Defendants argue that the WDTPA is insufficiently pleaded because it is premised on nondisclosures. Def. Br. at 17-18. But this argument is based on mischaracterizations of the Complaint and should be rejected. Defendants' assertion that the WDTPA claim is based on nondisclosures ignores the actual text of the Complaint. The Complaint alleges that: (1) Defendants *affirmatively* represented to the public through their express warranty, their website, brochures, and other documents available to the public, that the Windows were free of defects (Compl ¶¶ 41, 44, 105); (2) those representations were "untrue, deceptive or misleading" (*id.* ¶¶ 177-181); and (3) the representations materially induced a pecuniary loss to Mr. Gengler and the Class (*id.* ¶¶ 188-189). These allegations are sufficient to make out a WDTPA claim. *See Novell v. Migliaccio*, 2008 WI 44, ¶ 49, 309 Wis. 2d 132, 151, 749 N.W.2d 544, 553 ("there are three elements in a § 100.18 cause of action: (1) the defendant made a representation to the public with the intent to induce an obligation, (2) the representation was 'untrue, deceptive or

misleading,' and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff").

### D. Defendants' argument that Mr. Gengler's express warranty and contract claims should be dismissed is neither supported by the allegations in the Complaint, nor has it been tested by Windsor's own service providers.[10]

Defendants' next argument, that Mr. Gengler's express warranty and contract claims should fail, is also specious. Defendants base their argument upon the unconfirmed assumption that the humidity level in Mr. Gengler's home was too high, and that the moisture intrusion Mr. Gengler experienced was caused by condensation—which is not covered by the 10-year warranty. Def. Br. at 25-28.

In making this argument, Defendants ignore the allegations in the Complaint of the numerous other customer complaints it has received about the defective nature of its Windows and the allegations of the other complaints consolidated before this Court. Instead, Defendants single out Mr. Gengler because he rather unfortunately attributed the moisture issues with his Windows to condensation in an e-mail to the Defendants, and state that his claims should fail because he "has offered zero factual support for this alternative theory" before discovery has even commenced. Def. Br. at 26.

In support of their conclusory argument based upon facts that are not even before the Court, Defendants cite to an unpublished decision involving window condensation that *went to trial*, and where the plaintiffs unable to demonstrate a defect to the jury beyond the condensation that had formed on the windows. *Goldberg v. Dimaggio*, 2015 WI App. 68, ¶ 5, 364 Wis. 2d

---

[10] Mr. Gengler is not presenting argument in opposition to Defendants' motion to dismiss his implied warranty claims. He notes that Defendants have challenged his characterization of the implied warranty (Def. Br. at 21-25), but those arguments were not made in connection with Mr. Gengler's express warranty claims.

757, 869 N.W.2d 170 (unpublished). Importantly, the plaintiffs in *Goldberg*, although they eventually failed on the merits of their claims, were able to test their claims in front of a jury, obtain discovery, and move past the pleadings stage. Here, Defendants want to foreclose that opportunity because of their assumption that Mr. Gengler's Windows are merely suffering from condensation issues and that he cannot proceed to test the merits of an "unspecified window defect" supported by only "conclusory assertion[s]"—but that is a complete misreading of the Complaint.

Contrary to Defendants' *Iqbal* and *Twombly* arguments, Mr. Gengler's Complaint is not based upon some unspecified defect in the Windows. To the contrary: Mr. Gengler specifies the defects in great detail:

- "At the time the Windows leave the manufacturing plant, they contain a defect—undetectable to consumers—that allows water to infiltrate and pass through the Windows' frame corners, glazing pocket, and aluminum cladding, leading to deterioration of the wood components of the window and water and air leakage into the interior of the home damaging the interior wall cavity, trim, drywall, framing components, and other property." Compl. ¶ 3.

- "The wood preservative applied to the wood components of the Windows is also inadequate in its composition and application, further accelerating the rate of the deterioration." *Id.* ¶ 3.

- "Specifically, the defects allow  water to infiltrate and pass through the windows, causing deterioration and rot of the Windows' wood elements, which is further exacerbated by the fact that the wood preserve is inadequate in its composition and application." *Id.* ¶ 17.

- "The wood rot has and will progress to other wood components in the window and adjoining structure, as well as permit air and water leakage due to loss of structural integrity unless the Windows are repaired and replaced." *Id.*

- "The leakage through window frame corners, at the glazing pockets, and other areas has and will cause damage to areas adjacent to the Window, including the wall cavity, trim, framing, drywall, and other property in the home." *Id.*

- "Given that the defects are otherwise undetectable to consumers, the deterioration occurs over such a period of time that it does not become visible until it has advanced

to irreparable damage, and is also masked by cladding and window components (i.e. back dam, meeting rail, trim, etc.)." *Id.*

- "[T]he Windows are defective and fail to perform at Plaintiff's residence and at Class Members' residences by permitting water intrusion through unsealed or inadequately sealed areas of the Windows' frames and sashes, and into the interior of the residences." *Id. ¶ 22.*

- "The Windows are defective and prematurely failing at Plaintiff's residence and at Class Members' residences by permitting water to penetrate the wood components of the Windows, wherein it is absorbed by wood members, and causes rot, premature degradation, leaking, and failure of the wood. The wood preservative applied is defective in its composition and application, which fails to protect the wood components and accelerates the rate of deterioration." *Id. ¶ 23.*

- "In fact, the damage discovered by Mr. Gengler was actually caused by defects in the Windows which allowed moisture, air, and water to intrude into Mr. Gengler's home for years, resulting in property damage to the Windows and their home including, but not limited to, damage to drywall, trim, and likely other areas which are concealed by window and building components." Compl. ¶ 79.

Indeed, the defects described in Mr. Gengler's Complaint are similar to those found in the other complaints pending in this multi-district case, as the Judicial Panel on Multidistrict Litigation acknowledged: "[t]hese actions. . . share factual questions arising from allegations that windows in two Windsor product lines, Pinnacle and Legend Hybrid, are defective in that purported deficiencies in Windsor's design, engineering, and manufacturing practices cause the windows to leak, and the leaks eventually result in wood rot." *In re Windsor Wood Clad Window Prods. Liab. Litig.*, MDL No. 2688, 2016 U.S. Dist. LEXIS 47524, at *2 (J.P.M.L. Apr. 7, 2016). This case is not tied to the mere symptoms of the defects Mr. Gengler observed in e-mails to the Defendants; rather, it involves serious allegations of defects which should be permitted to go forward beyond the pleadings stage.

The mere fact that the Defendants denied Mr. Gengler's warranty claim should not be the determinative factor as to whether his warranty and contract claims can proceed when viewing

the allegations in the light most favorable to the Plaintiff.[11]  While the warranty does not cover "[d]amage caused by or adjustment required from. . . condensation," the crux of Mr. Gengler's complaint is not that condensation caused the damage to his home, drywall, trim, walls, and other property—but that the defects described above did.  Compl. ¶¶ 3, 8, 17, 26.

### E.  Mr. Gengler's Magnuson-Moss express warranty claim survives.

Defendants claim that because Mr. Gengler's warranty claim fails, so too his Magnuson-Moss claim.  But because his warranty and contract claims survive, the Magnuson-Moss claim based upon his express warranty survives, as well.  *Mayberry v. Volkswagen of Am., Inc.*, 2005 WI 13 ¶ 16, 278 Wis. 2d 39, 50, 692 N.W.2d 226, 232.[12]

### F.  Mr. Gengler's declaratory and injunctive relief claims are proper.

Defendants advance three main arguments for dismissing Plaintiff's declaratory relief claim. Def. Br. at 29-30.  All three should be rejected.

### 1.  The requested declaratory relief is proper.

Defendants' first argument is that the relief requested in his Complaint is beyond the scope of that which is authorized in the declaratory relief statute.  Def. Br. at 29.  But the requested relief is clearly permissible because the Seventh Circuit approved certification of an

---

[11]  The Court should also reject Defendants' invitation to prematurely adjudicate class certification based upon their misrepresentations of the allegations in Mr. Gengler's Complaint. Def. Br. at 28, n.16.  Any determination as to class certification should be made after Mr. Gengler has an opportunity to conduct discovery and the Court conducts a rigorous analysis as to the requirements of Rule 23.  *West v. Act II Jewelry, LLC*, No. 15 C 5569, 2016 U.S. Dist. LEXIS 34963, at *5 (N.D. Ill. Mar. 18, 2016) (challenges to class certification requirements premature at pleadings stage).

[12]  Whether or not the "remedies available for [Defendants' breach of their warranty] would be limited" is no basis for dismissal, and the case cited by the Defendants does not support dismissal of Mr. Gengler's claim for failure to state a claim on the basis of a limited warranty. *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004) (dismissal on basis of lack of subject matter jurisdiction; not as to whether plaintiff could state a claim).

injunctive class requesting similar declaratory relief in another case involving defective windows. In *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010), the Seventh Circuit affirmed the certification of a class defined as "all class members who own structures containing Pella ProLine aluminum-clad casement windows manufactured from 1991 to the present, whose windows have not yet manifested the alleged defect or whose windows have some wood rot but have not yet been replaced," for the following requested declaratory relief:

> If successful, these class members would be entitled to six declarations that together essentially declare that [a] all ProLine windows have a defect which results in premature rotting and this defect requires disclosure; [b] that Pella modified its warranty without notice by creating the enhancement program; [c] that Pella must notify owners of the defect; [d] that the ten-year limitation in the original warranty is removed; [e] that Pella will reassess all prior warranty claims related to wood rot; [f] and that Pella, upon a class member's request, will pay the cost of inspection to determine whether the wood rot is manifest, with any coverage disputes adjudicated by a Special Master. This class adjudication process would be followed by an individual claims process in which class members may file a claim with Pella for service '[i]f and when their windows manifest wood rot due to the alleged defect.' The district court explained that absent class members also may bring individual suits for money damages.

*Pella Corp.*, 606 F.3d at 392 (brackets added).

Likewise here, Mr. Gengler request declaratory relief that mirrors the declaratory relief requested in *Pella Corp.* on behalf of a National Injunctive Relief Class consisting of "[a]ll persons and entities in the United States, who own or owned homes in which Defendants' wood clad windows are installed." (Compl. ¶ 81). Moreover, the Seventh Circuit's explanation of the nature of the requested declaratory relief fits the language of the declaratory relief statute:

> Those who have replaced their windows are properly members of the (b)(3) class because they require the award of damages to make them whole. Those who have not replaced their windows but might in the future because of the purported design flaw are properly members of a (b)(2) class. Such purchasers would want declarations that there is an inherent design flaw, that the warranty

extends to them and specific performance of the warranty to replace the
windows when they manifest the defect, or final equitable relief.

*Pella Corp.*, 606 F.3d at 395; *see* 28 U.S.C. § 2201(a) (a court may "declare the rights and

other legal relations of any interested party seeking such declaration, whether or not further

relief is or could be sought").

Meanwhile, none of Defendants' authorities provide any support for their position that

the requested declaratory relief is improper.  In *Steffel v. Thompson*, 415 U.S. 452 (1974), the

Supreme Court held that "federal declaratory relief is not precluded when no state prosecution is

pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state

criminal statute." *Steffel*, 415 U.S. at 475. And in *Deveraux v. City of Chicago*, 14 F.3d 328 (7th

Cir. 1994), the Seventh Circuit held that no declaratory judgment could be granted on an issue

that would not "bind the [defendant] or alter the legal relationship of the parties."  *Deveraux*, 14

F.3d at 331.  Here, in contrast, the requested declaratory relief would bind Defendants to the fact

that the Windows suffer an "inherent design flaw," establish that Class members whose injuries

have yet to manifest from the defective Windows are covered by Defendants' warranty, and

compel Defendants to the replace the Windows when the defect does manifest.

### 2. The relief will govern the parties' future relationship.

Although Defendants characterize Mr. Gengler's request for relief as only instructive "as

to *the past*, not *the future*," such a characterization patently ignores the actual declaratory and

injunctive relief Mr. Gengler is seeking.  Unlike *Collegians for a Constructive Tomorrow-*

*Madison v. Regents of Univ. of Wisconsin Sys.*, 820 F. Supp. 2d 932 (W.D. Wis. 2011), there are

"ongoing violations" of Mr. Gengler's and the Class' contractual rights and "ongoing" statutory

and tort injuries from Defendants' continuing policy of refusing to honor the express warranty or

otherwise repair the Windows.  *Collegians for a Constructive Tomorrow-Madison*, 820 F. Supp.

2d at 952.  So a declaratory judgment would remove "a cloud of uncertainty" over the rights of Class members, especially those whose injuries have yet to manifest from the defective Windows.  *Id.*

### 3. Defendants' last argument is premature and unpersuasive.

Finally, Defendants argue that, because Mr. Gengler's other claims fail, then the declaratory and injunctive relief claim must fail, as well.  As the majority of Mr. Gengler's claims will survive the pleadings stage, Defendants' insistence that he would be unable to base his request on any substantive claims that this Court dismisses is premature, while Defendants' authorities are distinguishable.  Def. Br. at 30.  *See Saltzman v. Pella Corp.*, No. 06 C 4481, 2007 WL 844883, at *6 (N.D. Ill. Mar. 20, 2007) ("I may be quite unlikely to grant the declaratory relief Mr. Gengler is requesting. Nevertheless, based on the standards for motions to dismiss under Fed. R. Civ. P. 12(b), it is premature to make that determination here"); *cf. Cornucopia Inst. v. U.S. Dep't of Agric.*, 560 F.3d 673, 675 (7th Cir. 2009) (requested declaratory relief moot where defendant provided requested relief); *Ferguson-Kubly Indus. Servs., Inc. v. Circle Envtl., Inc.*, 409 F. Supp. 2d 1072, 1082 (E.D. Wis. 2006) (reasoning that court has ability to establish law applicable to parties' agreement through a declaratory judgment).

### G. Mr. Gengler requests leave to amend if the Court finds any of the foregoing claims deficient.

Leave to amend is liberally granted. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012). "[W]hile a court may deny a motion for leave to file an amended complaint, such denials are disfavored." *Gevas v. Mitchell*, 492 Fed. Appx. 654, 658-59 (7th Cir. 2012) (quotation omitted).  The few exceptions to this general rule of permissiveness, however, are where amendment would be futile or is

sought in bad faith. *Foman*, 371 U.S. at 182; *Gevas*, 492 Fed. Appx. at 659 (citation omitted). To date, Mr. Gengler has not amended his Complaint and no discovery has occurred. The circumstances here clearly permit amendment should the Court deem any part of the claims discussed above deficient.

### III.   CONCLUSION

Defendants argue that dismissal of Mr. Gengler's claims is appropriate because he initially—based upon Defendants' representations to him—believed that the moisture problem he was experiencing from his Windows was due to high humidity levels in his home.   But the fact is Mr. Gengler's Windows are defective, like all of the other Windows designed, manufactured, marketed, and sold by the Defendants, and he has stated those defects, which are covered under Defendants' warranty, with specificity.  Mr. Gengler has more than satisfied the pleadings standards at the motion to dismiss stage by pointing to Defendants' misrepresentations, and the specific defects at issue in his Complaint.  Defendants' motion to dismiss should be denied as to Mr. Gengler's express warranty, Magnuson-Moss, contract, deceptive trade practices, fraudulent misrepresentation, fraudulent concealment, strict liability, and declaratory and injunctive relief claims.

<div style="margin-left:50%">

Respectfully submitted,

/s/ Kara A. Elgersma

Kara A. Elgersma
Wisconsin Bar No. 1082121
WEXLER WALLACE LLP
55 West Monroe St., Suite 3300
Chicago, IL 60603
Tel. 312.346.2222
Fax 312.346.2222
kae@wexlerwallace.com

</div>

Edward A. Wallace
 *Plaintiffs' Steering Committee*
Amy E. Keller
 *Plaintiffs' Steering Committee*
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Tel. 312.346.2222
Fax 312.346.2222
eaw@wexlerwallace.com
aek@wexlerwallace.com

*Counsel for Plaintiff Shawn Gengler and Putative Class Members*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served using this Court's CM/ECF service, which will send notification of such filing to all counsel of record this 8th day of July 2016.

/s/ Kara A. Elgersma
Kara A. Elgersma